UNITED STATES of America, Plaintiff,

v.

VERTAC CHEMICAL CORP., et al., Defendants.

ARKANSAS DEPARTMENT OF POLLUTION CONTROL AND ECOLOGY, Plaintiff,

v.

VERTAC CHEMICAL CORP., et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

PHOENIX CAPITAL ENTERPRISES, et al., Defendants.

Civ. Nos. LR–C–80–109, LR–C–80–110 and LR–C–87–833.

United States District Court,
E.D. Arkansas, W.D.

Feb. 4, 1991.

Charles Banks, U.S. Atty. by A. Douglas Chavis, III, Asst. U.S. Atty., Little Rock, Ark., Gary S. Guzy, Roger Marzulla, U.S. Dept. of Justice, Land and Natural Resources Div., Washington, D.C., Mel McFarland, Carla S. Nelson, E.P.A., Region VI, Dallas, Tex., Craig D. Galli, U.S. Dept. of Justice, Land and Natural Resources Div., Environmental Defense Section, Washington, D.C., for U.S.

Robert R. Ross, Arnold, Grobmyer & Haley, Timothy O. Dudley and Stephen C. Engstrom, Wilson, Engstrom, Corum & Dudley, D. Allan Gates, Mitchell, Williams, Selig & Tucker, Little Rock, Ark., Scott Slaughter, Newman & Holtzinger, Washington, D.C., for Vertac Chemical Corp.

Charles R. Nestrud, Chisenhall, Nestrud & Julian, Little Rock, Ark., for Inter-Ag Corp. and C.P. Borman, Jr.

Steve A. Weaver, Dept. of Pollution Control & Ecology, Little Rock, Ark., for Arkansas Dept. of Pollution Control and Ecology.

N.M. Norton, Jr. and Charles L. Schlumberger, Wright, Lindsey & Jennings, Little Rock, Ark., Allen Malone, Apperson, Crump, Duzane & Maxwell, Memphis, Tenn., Roxanne Jayne, Law Dept., Hercules, Inc., Wilmington, Del., and V. Robert Denham, Jr., Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for Hercules, Inc.

Charles R. Nestrud, Chrisenhall, Nestrud & Julian, Little Rock, Ark., James A. Rogers, Skaden, Arps, Slate, Meaghen & Flom, Washington, D.C., for Phoenix Capital Enterprises, Inc.

J. Randal Tomblin, Germantown, Tenn., pro se.

Carol S. Arnold, Rose Law Firm, Little Rock, Ark., for Dow Chemical Co.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

Pending before the Court is the motion of the United States for entry of a consent decree.[1] The proposed Consent Decree arises out of a consolidated action against Phoenix Capital Enterprises, Inc., Inter-Ag Corporation, InterCapital Industries, Inc., Pat Bomar, and J. Randal Tomblin (referred to collectively as the "Phoenix parties") under section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), section 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973, and the Federal Priority Statute, 31 U.S.C. § 3713. The

---

1. Tomblin and the other Phoenix defendants have also filed motions for entry of the proposed consent decree.

proposed Consent Decree resolves the Phoenix parties' liability under these and other applicable state and federal environmental statutes identified in the Consent Decree at paragraph 12, "Covered Matters," in exchange for the Phoenix parties' agreement to reimburse the United States for a portion of cleanup costs necessary to complete the response actions at the Vertac site. Pursuant to 28 C.F.R. § 50.7 and section 122(d)(2)(B) of CERCLA, 42 U.S.C. § 9622(d)(2)(B), the United States published a Notice of Lodging of the proposed Consent Decree in the Federal Register on November 22, 1989, 54 Fed.Reg. 48331–32 (1989). The Notice of Lodging described the proposed Consent Decree and invited the public to comment on the proposed decree for 30 days.

The United States received two comments, letters from Hercules Incorporated ("Hercules"), and Dow Chemical Company ("Dow"), both defendants at the time in this action.[2] After reviewing both the public comments, the United States on April 30, 1990, filed a motion for entry of the consent decree. Hercules opposed the motion on several grounds to be discussed below.[3]

## HISTORY OF LITIGATION

The instant action was commenced in 1980 when the United States and the Arkansas Department of Pollution Control and Ecology ("ADPC & E") filed suit against Vertac and Hercules pursuant to the RCRA, the Clean Water Act, the Refuse Act, and Arkansas law, and seeking injunctive relief against these parties for the contaminated conditions at the Vertac Chemical Corporation Superfund Site.[4]

The Court issued a preliminary injunction against Vertac in May, 1980, requiring it to conduct remedial action to construct and repair clay cover areas over waste burial areas. On January 18, 1982, the Court entered a Consent Decree, under which Vertac agreed to take certain action in regard to the clean-up on-site.

In 1986, Vertac wanted to spin-off several of its assets, including other plant sites. The United States, ADPC & E, and Vertac entered into a stipulation under which the United States and ADPC & E agreed not to challenge Vertac's spin-off after Vertac agreed to provide financial assurances that it would meet its environmental clean up responsibilities under the Consent Decree. In particular Vertac agreed to put up a $6.7 million trust fund, a $4 million letter of credit for environmental cleanup of the Vertac site, and a $3.15 million disbursement from the shareholders. The money in the letter of credit was later placed in the trust fund. After the spin-off, Vertac owned only the Jacksonville plant site and a pesticide marketing operation run from its Memphis, Tennessee headquarters. The Jacksonville plant site had ceased operations; there were, however, 28,000 drums and 194 bulk storage tanks of waste left aboveground. Additionally, the soils and buildings in the manufacturing area were contaminated.

By late 1986, Vertac was a wholly-owned subsidiary of Phoenix Capital Enterprises, Inc. ("Phoenix"). C.P. Bomar, Jr., was the sole shareholder of Phoenix as well as its president and sole director. Bomar was

---

**2.** The claims the United States had against Dow were resolved in a May 12, 1989, Settlement Agreement between the United States and Dow. On November 6, 1989, the Court dismissed the claims of the United States against Dow with prejudice.

**3.** Dow stated that it no longer opposed the entry of the Consent Decree.

**4.** Located in Jacksonville, Arkansas, the Vertac Site is a former pesticide manufacturing plant which was operated first by Hercules from 1962 through 1971, and then operated by Transvaal, later named Vertac, from 1971 through 1987.

Until the late 1970's, the plant was used to manufacture a variety of pesticides and herbicides, including 2, 4, 5–T which contained the contaminant dioxin. After further production of 2,4,5–T was prohibited, the plant continued to manufacture a variety of other pesticides and herbicides until it was abandoned in 1987. During Transvaal's and Vertac's fifteen year operation of the plant, numerous drums of waste from the pesticide operations were buried beneath the ground and stored above ground at the Site, and a variety of hazardous wastes, including dioxin, escaped, contaminating local waterways, residential property, and a publicly owned sewage treatment plant.

also chairman of the board of Vertac. J. Randal Tomblin was president and a director of Vertac. Bomar incorporated InterCapital Industries, Inc. ("InterCapital") as a subsidiary of Phoenix, and Inter–Ag Corporation ("Inter–Ag") as a subsidiary of InterCapital. Bomar was president and sole director of both InterCapital and Inter–Ag; Tomblin was executive vice-president of Inter–Ag.

In February, 1987, Vertac sold the pesticide marketing operation to Inter–Ag for $1.675 million. Inter–Ag occupied the same offices, hired the same employees, and sold the same products to the same customers as Vertac had. Dow transferred the supply contract it had with Vertac to Inter–Ag.

Upon learning of the transfer of Vertac's assets, the United States and ADPC & E filed a motion seeking the appointment of a receiver for Vertac and to have Inter–Ag be declared a successor to Vertac. After a hearing, the Honorable Judge Henry Woods held that Inter–Ag was a successor to Vertac, and appointed a receiver for Vertac and Inter–Ag. *United States v. Vertac Chemical Corporation*, 671 F.Supp. 595 (E.D.Ark.1987). The Eighth Circuit Court of Appeals subsequently vacated the order as to Inter–Ag because only Vertac had been served with process. *United States v. Vertac Chemical Corp.*, 855 F.2d 856 (8th Cir.1988).

The United States subsequently added Inter–Ag as a party to the original 1980 action and filed a separate suit against Phoenix, Bomar, and Tomblin, alleging they were liable under section 107(a) of CERCLA, 42 U.S.C. § 9607(a), section 7003 of RCRA, 42 U.S.C. § 6973, and the Federal Priority Statute, 31 U.S.C. § 3713. A trial was scheduled, but prior to its commencement, the United States and the Phoenix parties began negotiations which resulted in the proposed Consent Decree.

## DISCUSSION

The proposed Consent Decree resolves the liability of the Phoenix parties under CERCLA, RCRA, the Federal Priority Statute, and other federal and state environmental laws in return for their payment of $1.84 million for cleanup costs, $126,000 for natural resource damages caused by the contamination, and 33 percent of all future pre-tax profits earned over the next twelve years, or forty percent of the liquidation value, in the event Phoenix is liquidated before the termination date.

■ The Court has carefully reviewed the proposed Consent Decree and the lengthy objection filed by Hercules. In reviewing the proposal, the Court is guided by several basic principles. The law favors settlements. The policy encouraging settlements "has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement." *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 84 (1st Cir.1990). Furthermore, the public policy favoring settlement is reflected in the governing statute, CERCLA. *See United States v. Acton Corp.*, 733 F.Supp. 869, 872 (D.N.J.1990).

■ Before approving a CERCLA settlement, the Court must be convinced that it is fair, reasonable, and consistent with the objectives of CERCLA. *Cannons Engineering*, 899 F.2d at 84. *See also City of New York v. Exxon Corp.*, 697 F.Supp. 677, 692 (S.D.N.Y.1988); *United States v. Conservation Chemical Co*, 681 F.Supp. 1394, 1415 (W.D.Mo.1988).

Hercules raises a number of objections. It contends that the settlement is contrary to the express provisions of the CERCLA provisions governing settlements. 42 U.S.C. § 9622. In particular, Hercules argues that the statute prohibits a "cash out" settlement with a non *de minimis* party where no remedy has been selected or completed; that the covenant not to sue is permitted only when remedial action has been completed; and that the settlement does not contain a reopener provision as required by section 122(f)(6)(A).

■ The Court is not persuaded that the statutory language of section 122 is to be construed so narrowly. CERCLA is a remedial statute, and the EPA must be

granted some discretion in fashioning settlements which are fair and reasonable under the circumstances, while furthering the objectives of CERCLA. In passing the Superfund legislation, Congress directed the President to "expedite effective remedial actions and minimize litigation." *City of New York,* 697 F.Supp. at 693.

The Court notes that the legislative history surrounding Section 122 reveals a congressional concern that so-called "sweetheart" deals not be approved. The Court is persuaded that the settlement offered here is the result of good faith, arms' length negotiations. The Court also notes that certain provisions in the proposed Consent Decree reveal that it is a far cry from a sweetheart deal. Certain stringent limitations are imposed on the Phoenix parties to ensure that they will be able to fully meet their financial obligations under the decree: their salaries, fringe benefits, and ability to borrow money are severely limited. The Phoenix parties must undergo an annual audit by a certified public accountant. If it is determined at any time that material assets have not been disclosed by any of the Phoenix parties, the covenant not to sue shall not be effective, thereby invalidating the decree.

Hercules also argues that the Consent Decree is not fair, reasonable, and consistent with CERCLA. The gravamen of Hercules' complaint is that the Phoenix parties are getting a "bargain basement" deal, and that they should be held fully liable as a successor to Vertac.

The Court notes that although the amount of money the Phoenix parties will have to pay will in all likelihood be a small percentage of the total response costs, the Court is persuaded that the settlement represents a recovery of the maximum possible amount of money obtainable from the Phoenix parties given their net worth and their limited ability to pay. The United States states that the $1.84 million represents about fifty percent of the Phoenix parties' net worth. Certainly, the finite resources of the Phoenix parties are better put to use in helping to clean up the Jacksonville site than in litigation costs.

In sum, the Court finds that the Consent Decree is fair, reasonable, and consistent with the purposes and objectives of CERCLA and that the entry of the proposed decree is appropriate. A copy of the decree, signed by the Court, is appended hereto.

Accordingly, the motions for entry of the consent decree are granted.

IT IS SO ORDERED.

## APPENDIX

United States District Court

Eastern District of Arkansas

Western Division

Nos. LR–C–80–109, LR–C–80–110, LR–C–87–833

United States of America, Plaintiff,

v.

Vertac Chemical Corporation, Inter–Ag Corporation and Hercules, Inc., Defendants.

Arkansas Department of Pollution Control and Ecology, Plaintiff,

v.

Vertac Chemical Corporation, Inter–Ag Corporation and Hercules, Inc., Defendants.

United States of America, Plaintiff,

v.

Phoenix Capital Enterprises, Inc., C.P. Bomar, Jr., J. Randal Tomblin, and Dow Chemical Company, Inc., Defendants.

CONSENT DECREE

1. *Parties Bound*

The Parties to this Consent Decree are the United States of America on behalf of the United States Environmental Protection Agency and the United States Department of the Interior ("United States"), the State of Arkansas, through and by the Arkansas Department of Pollution Control and Ecology ("ADPC & E"), Phoenix Capital Enterprises, Inc. ("Phoenix"), InterCapital Industries, Inc. ("InterCapital"), Inter–Ag Corporation ("Inter–Ag"), C.P. Bomar,

Jr. ("Bomar"), and J. Randal Tomblin ("Tomblin"). Phoenix, InterCapital, Inter–Ag, Bomar and Tomblin shall be referred to collectively herein as the "Phoenix Parties." This Consent Decree shall apply to and be binding upon the Phoenix Parties, their Subsidiaries, successors and assigns. The officers, directors, shareholders and agents of Phoenix or any of its Subsidiaries shall be bound in their corporate capacity to see that those corporations comply with the terms of this Consent Decree. Any change in the ownership or corporate status of any of the Phoenix Parties shall in no way alter their obligations under this Consent Decree, unless a specific waiver has been provided in writing by an authorized representative of the United States. Vertac Chemical Corporation ("Vertac") is not a party to this Consent Decree.

## 2. *Jurisdiction*

This Court has jurisdiction over the subject matter of these actions, pursuant to 28 U.S.C. §§ 1331, 1345, 42 U.S.C. §§ 6972, 6973, 9606 and 9607. For purposes of this Consent Decree, this Court has personal jurisdiction over the defendant Phoenix parties, and all of the Phoenix Parties waive all objections to jurisdiction. Venue is proper in this district and all of the Phoenix Parties waive all objections to venue.

## 3. *Definitions*

a. For purposes of this Consent Decree, the term "Covered Areas" shall mean the industrial plant site still owned and formerly operated by Vertac in Jacksonville, Arkansas, those off-site areas identified in and investigated under the Vertac off-site area Remedial Investigation and Feasibility Study (including the Endangerment Assessment) publicly released in June 1986, including but not limited to the Jacksonville Publicly Owned Treatment Works, the Bayou Meto, Rocky Branch Creek and Lake Dupree, and to the Rogers Road (Jacksonville) and Graham Road landfills. The term "Vertac Plant Site" shall refer to all real and personal property owned by Vertac in Pulaski County, Arkansas.

b. For purposes of this Consent Decree, the term "Subsidiaries," shall refer to all of the present and future subsidiaries of Phoenix Capital Enterprises, Inc., including, but not limited to, InterCapital Industries, Inc., Inter–Ag Corporation, International Business Centers, Inc. and Executive Suites, Inc., but not including Vertac Chemical Corporation.

c. The term "Vertac" shall mean the Vertac Chemical Corporation.

d. The term "Environmental Trust Fund" shall mean the Environmental Trust Fund established under the Stipulation of July 15, 1986 in this action.

e. The term "RCRA Closure Trust Fund" shall mean the trust fund maintained on behalf of Vertac at the First Jacksonville Bank, escrow account no. 7600000670.

f. Where applicable, terms used in this Consent Decree shall have the meanings consistent with their use in the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, and the Resource Conservation and Recovery Act, as amended ("RCRA"), 42 U.S.C. § 6901 *et seq.*

g. For purposes of paragraph 13.b herein, the term "Material Asset" shall mean any asset, or group of similar assets (such as a group of securities or other financial instruments, or real estate interests, or bank accounts) with a fair market value in excess of $25,000 as of the date of entry of this Consent Decree.

h. The term "Termination Date" shall mean the date when this Consent Decree terminates, as provided for in paragraph 20.c.

## 4. *Payment By Phoenix Parties*

Within ten (10) days of the entry of this Consent Decree, the Phoenix Parties shall pay into the RCRA Closure Trust Fund maintained on behalf of Vertac at First Jacksonville Bank, escrow account no. 7600000670, the sum of ONE MILLION

EIGHT HUNDRED FORTY THOUSAND DOLLARS ($1,840,000). These funds are to be used for the purpose of response and environmental compliance in the Covered Areas, subject to the joint approval of the United States and ADPC & E. Unless and until these funds are paid the covenants not to sue in paragraph 13 of this Consent Decree shall not be effective.

### 5. Access and Non-interference in Response Actions

The Phoenix Parties hereby agree to allow the United States, ADPC & E, their contractors, or any third party acting under a Consent Decree or Administrative Order with the United States or ADPC & E relating to the Covered Areas, access to the Covered Areas to perform any or all response actions, selected by the United States or ADPC & E. The Phoenix Parties further agree not to object to or oppose any activities or any response measures proposed or implemented by the United States, ADPC & E or any third party acting pursuant to a Consent Decree or Administrative Order in the Covered Areas through the instigation of litigation or participation in administrative proceedings, except through subpoena or other involuntary appearance, as long as the Covenants Not to Sue in paragraph 13 remain in effect. The Phoenix Parties agree not to transfer or to consent to the transfer of any real property owned by Vertac in the Covered Areas, without the succeeding owner agreeing to provide the United States and ADPC & E with access on the same terms as provided in this paragraph.

### 6. Receivership of Vertac

The Phoenix Parties shall not object to the continuation of the receivership over Vertac for as long as the United States or ADPC & E seek to continue that receivership. The Phoenix parties hereby release Vertac and Lee S. Thalheimer and all subsequent receivers of Vertac for all claims which the Phoenix Parties may have against them now or in the future for any acts which they may undertake in imple-menting or paying for response measures proposed, implemented or approved by the United States or ADPC & E. This Consent Decree does not create an affirmative obligation for the Phoenix Parties to take any action with respect to Vertac or the Vertac Plant Site in the event of Vertac's bankruptcy or liquidation or the dissolution of Vertac's receivership.

### 7. Distribution of Assets by or Liquidation of Vertac

The Phoenix Parties agree that no asset of Vertac or the proceeds of the sale thereof shall be distributed to any of Vertac's shareholders, unless and until the claims of the United States and ADPC & E against Vertac are fully satisfied. The Phoenix Parties agree not to oppose any portion of any liquidation plan for Vertac or any distribution of assets wherein the United States and ADPC & E as creditors of Vertac have priority over the Vertac shareholder(s). The Phoenix Parties also agree not to oppose any portion of any liquidation plan for Vertac or any distribution of assets wherein the United States is granted priority over other creditors under 31 U.S.C. § 3713 in the distribution of Vertac's assets; or wherein environmental expenditures are given priority as administrative expenditures of a receivership or trusteeship, whether in or out of bankruptcy. The Parties intend to seek the liquidation and dissolution of Vertac, prior to any termination of its receivership. The Phoenix Parties further agree that none of the assets of Vertac, including any appreciation of the value of its property, shall be paid to its shareholders unless and until the claims of the United States and ADPC & E against Vertac are paid in full. The Phoenix Parties release all claims they may have to the principal and income of the Vertac Environmental Trust and the RCRA Closure Trust Fund.

### 8. Future Financial Performance

a. Each calendar year from 1989 through 2000, Phoenix and its Subsidiaries shall pay thirty-three (33) percent of their consolidated pre-tax profits, if any, as determined in accordance with Appendix A

hereto (which is incorporated by reference and made part of this Consent Decree), into the EPA Superfund, provided that there shall be a credit of forty thousand dollars ($40,000) against the first forty thousand dollars ($40,000) due under this paragraph 8.a. Such payments shall be due on the April 15 of each year for the previous year. For purposes of determining annual profits, all dividends and any amounts paid for salaries, benefits, perquisites and expenses of directors and officers of these corporations in excess of the amounts identified in Appendix A shall not be considered valid corporate expenses. The payments to be made under paragraph 4 shall not be considered a loss for purposes of this Consent Decree. To the extent that Phoenix and its Subsidiaries realize any losses in any calendar year period from 1989 through 2000, the losses in that year may be used to offset profits in the following year. However, at the end of the twelve year period, Phoenix and its Subsidiaries shall pay any additional amounts which may be necessary so that the total payments made by Phoenix and its Subsidiaries under this paragraph are not less than thirty-three (33) percent of the pre-tax profits made by Phoenix and its Subsidiaries during the twelve year period as a whole.

b. The United States shall take no part in the conduct of business by Phoenix or its Subsidiaries. The United States shall not be consulted by Phoenix or its Subsidiaries in any business decision, nor shall the United States be considered a party to any contract into which Phoenix or its Subsidiaries enter or shall have entered. The United States shall have no vote on the board of directors of Phoenix or any of its Subsidiaries and shall not participate in any directors' meeting of any of these entities. The United States shall have no power to ratify any business decision by Phoenix or any of its Subsidiaries. The United States shall not be liable or legally responsible for any acts or omissions by the Phoenix Parties. However, nothing in this paragraph 8.b shall be construed to alter the Phoenix Parties' obligations to comply with the terms of this Consent Decree.

c. Phoenix and its Subsidiaries shall submit annual audited financial statements, including balance sheet, income statement, statement of retained earnings, statement of changes in financial position (on a cash or working capital basis), and any other statements or disclosures required by Generally Accepted Accounting Principles or Generally Accepted Auditing Standards, prepared by a certified public accountant, to the United States each year no later than March 31 of each year, identifying the pre-tax profit realized by Phoenix and its Subsidiaries. Phoenix shall also submit copies of its consolidated income tax return to the United States at the same time it submits that return to the Internal Revenue Service. The pre-tax profits of Phoenix and its Subsidiaries shall be calculated in accordance with the conditions and procedures identified in Appendix A.

d. Neither Phoenix nor any of its Subsidiaries shall transfer any stock or assets, other than lawful dividends paid pursuant to paragraph 8.a and Appendix A, to Phoenix's shareholders, except at appraised fair market value, by resolution of the board of directors, and without thirty (30) days prior notice to the United States and ADPC & E and their approval. If no response is given by the United States or ADPC & E within this thirty (30) day period, the Phoenix Parties may regard the non-responding party as approving the transaction. However, if the United States or ADPC & E request additional information about the transaction within thirty (30) days of receipt of notice, they shall have an additional thirty (30) days to consider the transaction from the date when they were fully provided with the requested information. If no response is given by the United States or ADPC & E within this additional thirty (30) day period, the Phoenix Parties may regard the non-responding party as approving the transaction.

e. In the event that Phoenix is liquidated prior to the Termination Date, forty (40) percent of the net proceeds of the liquidation shall be paid to the EPA Superfund. Such payment shall be made before the remaining proceeds are distributed to any shareholders. For purposes of liqui-

dation, repayment of any loans to shareholders shall be treated as proceeds, as shall all dividends received by the shareholders within two years prior to the date of liquidation. To the extent the funds remaining in Phoenix are insufficient to pay the United States its full forty (40) percent share of the net proceeds of liquidation of Phoenix, Bomar shall pay the difference to the United States to the extent of all dividends received by Phoenix shareholders within two years prior to the date of liquidation. However, if Phoenix is liquidated following the death of Bomar, even if his death occurs prior to the Termination Date, the United States shall not participate in the liquidation, unless the liquidation occurs in bankruptcy pursuant to paragraph 13.e, or Bomar has not left a surviving spouse.

f. If in the course of liquidation of Phoenix and/or its Subsidiaries, any of the assets of Phoenix and/or its Subsidiaries are purchased by any past or present officer, director or shareholder of any of those corporations or of Vertac, or by any entity with which such a person is associated, the sale shall be made at a value appraised by an independent third party. Phoenix shall not pledge any assets or otherwise guarantee any loans for which Phoenix or any of its Subsidiaries does not receive all of the benefit.

9. *Payments to Superfund*

All payments required to be made by the Phoenix Parties under paragraph 8 shall be made by certified check payable to the Hazardous Substance Response Fund, and sent to:

U.S. Environmental Protection Agency—
Region 6
Attn: Superfund Accounting
P.O. Box 360582M
Pittsburgh, PA 15251

Copies of all such checks shall be sent to the Chief, Environmental Enforcement Section, and the Regional Counsel, U.S. Environmental Protection Agency, Region 6, at the addresses provided in paragraph 17.

10. *Payment to the Department of the Interior*

Phoenix, its Subsidiaries and Bomar agree to pay ONE HUNDRED TWENTY-SIX THOUSAND DOLLARS ($126,000), at the rate of TWENTY–ONE THOUSAND DOLLARS ($21,000) per year for each of the six (6) years from 1989 through 1994 in addition to the amounts specified in paragraphs 4, 8 and 9 above. These payments shall be made by certified check made out to the following account:

U.S. Fish & Wildlife Service
Account No. 14X8216
ORD 43420
Subactivity No. 7102

The check shall be sent to:

U.S. Fish & Wildlife Service
Office of Finance
Denver Federal Center
P.O. Box 25208
Denver, CO 80223–0207
Attn: Ken Blegebron

A copy of the check shall be sent to Pete Escherich at the address specified in paragraph 19. These payments are to reimburse the U.S. Department of the Interior for the costs of its initial studies of natural resources in the Covered Areas. The first such payment shall be made within ten (10) days of entry of this Consent Decree. Each subsequent payment shall be made annually on the anniversary of the date of entry of the Consent Decree. These payments shall be made each year, regardless of whether Phoenix has earned a profit in any particular year. In the event of the liquidation of Phoenix prior to January 1, 1996, the unpaid balance shall be paid in full, with no discount for early payment.

11. *No Claims Against the Superfund*

The Phoenix Parties hereby agree that they shall make no claims against the Superfund with respect to response costs incurred at or in connection with the Covered Areas. Nothing in this Consent Decree shall be construed as preauthorization of a claim against the Superfund under section 112 of CERCLA, 42 U.S.C. § 9612.

### 12. *Covered Matters*

This Consent Decree is entered into pursuant to sections 113(f), 122(f)(6)(B) and 122(j) of CERCLA, 42 U.S.C. §§ 9613(f), 9622(f)(6)(B), 9622(j) and is in settlement of the following Covered Matters in accordance with the terms described in paragraph 13:

a. All civil claims, which have been made or which could have been made by the United States or ADPC & E through the date of entry of this Consent Decree, against any of the Phoenix Parties, whether such claim is reduced to judgment, liquidated or unliquidated, for abatement costs, removal costs, remedial costs, and all other response costs as defined under CERCLA, injunctive relief, civil penalties and natural resource damages, pertaining to the Covered Areas, under any of the following statutes:

(1) the Comprehensive Environmental Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("CERCLA");

(2) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Act Amendments of 1984 ("RCRA");

(3) those portions of the Clean Water Act administered by EPA;

(4) the Arkansas Solid Waste Management Act;

(5) the Arkansas Water and Air Pollution Control Act;

(6) the Arkansas Hazardous Waste Management Act;

(7) the Arkansas Remedial Action Trust Fund Act;

(8) the Arkansas Emergency Response Fund Act; and

(9) the Arkansas Resource Reclamation Act.

b. All civil claims by the United States and ADPC & E that any of the Phoenix Parties are liable as Vertac's successor in interest or corporate successor, as a mere continuation of Vertac or under the theory of *de facto* merger, or under an "alter ego" theory or under any other theory of "piercing the corporate veil" for the claims identified in paragraph 12.a.

c. All civil claims by the United States and ADPC & E against any of the Phoenix Parties that the transfer of assets from Vertac to Inter–Ag Corporation on February 9 and 10, 1987 constituted a fraudulent transfer or a violation of any applicable Bulk Sales Act for the claims identified in paragraph 12.a.

d. All civil claims of the United States under 31 U.S.C. § 3713 that the Phoenix Parties, or any of them, are liable to the United States as representatives of Vertac who paid debts to other Vertac creditors at a time when Vertac was insolvent and indebted to the United States for the claims under statutes identified in paragraph 12.a.

e. All civil claims by the United States and ADPC & E against the Phoenix Parties pertaining to violation of any present or prior Administrative Order, Consent Decree or Stipulation by Vertac in connection with the Covered Areas.

f. All civil claims by the United States and ADPC & E against any of the Phoenix Parties under the statutes identified in paragraph 12.a arising out of the sale of Vertac assets to Inter–Ag during 1987 and the transfer of assets to Cedar Chemical Corporation during 1986. Nothing herein is intended to waive any of the rights of the United States or ADPC & E under the Stipulation of July 15, 1986 against Vertac.

### 13. *Covenants Not to Sue*

a. Except as provided in paragraph 4 and subparagraphs 13.b, 13.c, 13.d, 13.e, 13.f and 13.g below, the United States and ADPC & E each covenant not to sue the Phoenix Parties for Covered Matters, as identified in paragraph 12. These covenants are intended to extend to future liability pursuant to section 122(f)(6)(B), 42 U.S.C. § 9622(f)(6)(B), and are issued because of the limited ability of the Phoenix Parties to pay for the response costs in the Covered Areas.

b. As conditions precedent to the entry of this Consent Decree, the Phoenix Parties have represented that their respective as-

sets, liabilities and financial conditions (excluding Vertac) have been fully disclosed to the United States and ADPC & E and that no Material Asset has been concealed from the United States or ADPC & E, that their Material Assets, including all foreign assets, have been fully disclosed to the United States and ADPC & E as identified in the affidavit of C.P. Bomar, Jr. as to himself, Phoenix (excluding Vertac), InterCapital and Inter–Ag, and in the affidavit of J. Randal Tomblin as to himself, that the financial statements attached to the affidavits have been subjected to agreed upon procedures by Peat, Marwick, Main & Co., and that the collective net worth of the Phoenix Parties (defined as the appraised value of assets as determined by Asset Services, Inc. less liabilities) (excluding Vertac) as of February 28, 1989, has been fairly stated in the written report from Peat, Marwick, Main & Co. J. Randal Tomblin further represents, as a condition precedent, that he has no present or future ownership interest in Phoenix or any of its Subsidiaries, that he has no options to purchase an ownership interest in these entities and he is not now employed by Phoenix or any of its Subsidiaries. In the event that the Phoenix Parties fail to identify any Material Asset in the Affidavits of Bomar and Tomblin, the Covenants Not to Sue contained in this paragraph shall not be effective; provided, however, if the Affidavit of Tomblin fails to identify any Material Asset, the Covenants Not to Sue extended to Tomblin shall not be effective as to him only and the Covenants Not to Sue extended to the remainder of the Phoenix Parties shall remain in effect and, likewise, if the representations in the Affidavit of Bomar fail to identify any Material Asset, the Covenant Not to Sue extended to the Phoenix Parties other than Tomblin shall not be effective as to them only and the Covenants Not to Sue extended to Tomblin shall remain in effect. The Covenant Not to Sue extended to Tomblin shall be ineffective if Tomblin has any present or future interest in Phoenix or any of its Subsidiaries or has any option to purchase an ownership interest in any of these entities.

c. These Covenants Not to Sue extended to the Phoenix Parties shall not be effective if the Phoenix Parties fail to make any payment required under this Consent Decree within sixty (60) days of the date due, but the ineffectiveness of the Covenants Not to Sue shall not relieve the Phoenix Parties of the obligation to make payments; moreover, interest on all late payments shall accrue from the date due at the rate established under section 107(a) of CERCLA, 42 U.S.C. § 9607(a). In the event of any dispute between the United States and the Phoenix Parties as to the calculation of any individual payment under paragraph 8 or with respect to the amount tendered for such payment, the Phoenix Parties shall timely pay the amount that is undisputed. As to the amount in dispute, the Phoenix Parties shall timely employ the dispute resolution procedure in paragraph 16, and the Covenants Not to Sue shall remain effective through the exhaustion of any timely appeals therefrom, and shall terminate if the Phoenix Parties fail to pay additional amounts determined to be owed to the United States within thirty (30) days of the final resolution of the dispute. However, if the dispute results from a position taken by any of the Phoenix Parties which is found by the Court to be frivolous or interposed for the purpose of delay, the Covenants Not to Sue shall be ineffective as of the date which any of the Phoenix Parties raises the dispute with the Court.

d. These Covenants Not to Sue shall not be effective if any of the Phoenix Parties breaches any of the agreements within paragraphs 5, 6 or 7.

e. These Covenants Not to Sue shall not be effective with respect to Phoenix if it files for a petition for bankruptcy or is subject to an involuntary petition for bankruptcy, which is not dismissed at any time before the Termination Date. In any such bankruptcy proceeding, the United States or ADPC & E may assert all its unsatisfied claims for Covered Matters without regard to the Covenants Not to Sue. Moreover, in the event of bankruptcy, all payments that have not been made under this Consent Decree shall be immediately due and owing. Nothing in this paragraph shall affect

the Covenants Not to Sue as to Bomar or Tomblin, unless Phoenix assets were fraudulently transferred to either of them prior to or during any bankruptcy proceeding, as determined under section 548(a) of the Bankruptcy Code or any amendment or superseding provision, in which event the Covenants Not to Sue to the transferee shall not be effective, except that if these transfers are invalidated under section 548(a)(2) of the Bankruptcy Code, and not under section 548(a)(1), the Covenants Not to Sue shall be reinstated if the Bomar or Tomblin return all such assets, or the full value thereof (less amounts previously paid for such assets), to Phoenix.

f. These Covenants Not to Sue shall not be effective with respect to any action by any of the Phoenix Parties occurring after the date of entry of this Consent Decree which action would subject any of them to new liability under any of the statutes identified in paragraph 12.a with regard to the Covered Areas.

g. Notwithstanding these Covenants Not to Sue, the Phoenix Parties agree that to the extent any of them acquires ownership or beneficial interest in the Vertac Plant Site or any Vertac fixtures, equipment, inventory, funds or assets in the future, the United States and ADPC & E retain the right to pursue the Phoenix Parties for the value of the real property, fixtures, equipment, inventory, funds or assets acquired, to the extent that the claims of the United States or ADPC & E against Vertac are unsatisfied.

### 14. *Matters not Covered in this Consent Decree*

This Consent Decree in no way relieves Vertac of any of its obligations under the Consent Decree of January 1982 *entered* in *United States v. Vertac Chemical Corporation,* No. LR–C–80–109 (E.D.Ark.) and *Arkansas Department of Pollution Control and Ecology v. Vertac Chemical Corporation,* No. LR–C–80–110 (E.D.Ark.) (the "Consolidated Suits"), the Stipulation of July 15, 1986 in the Consolidated Suits or any of its obligations under any federal or state law. This Consent Decree does not affect any claims which the United States or ADPC & E may have against Hercules, Inc., Dow Chemical Company, Inc. or *any other person* not a party to this Consent Decree. This Consent Decree does not affect any claims which the Phoenix Parties may have against any person or entity not a signatory to this Consent Decree except Vertac and its receiver(s).

### 15. *Contribution Protection*

The Phoenix Parties have hereby resolved their liability to the United States and ADPC & E under Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), with respect to Covered Matters and are entitled to the protection from contribution claims which it affords.

### 16. *Dispute Resolution*

This Court shall retain jurisdiction to resolve any dispute which may arise under this Consent Decree. The parties agree to attempt to resolve any disputes informally before seeking Court review. However, once the United States provides the Phoenix Parties with written notice by certified mail at the addresses identified in paragraph 17 of its final determination of the matter in dispute, that determination shall be binding on the Phoenix Parties, unless they file a petition in this Court to review the United States' determination within thirty (30) days of receipt of such written notice. In any dispute before this Court, the Phoenix Parties shall have the burden of proof. The Phoenix parties waive all rights to dispute the selection, implementation or appropriateness of any response measure for the Covered Areas, or the costs thereof, selected or implemented by the U.S. Environmental Protection Agency or the Arkansas Department of Pollution Control and Ecology, unless the Covenants Not to Sue in paragraph 13 have become ineffective.

### 17. *Receipt of Submittals*

All documents or information which need to be submitted under this Consent Decree

shall be submitted to the following addresses:

a. For the United States:
Chief, Environmental Enforcement Section
Land and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044
Regional Counsel
U.S. Environmental Protection Agency
Region 6
1445 Ross Avenue, 12th floor
Dallas, TX 75202
Pete Escherich
Environmental Contaminant Specialist
Department of the Interior
601 Broyhill Building
1000 North Glebe Road
Arlington, VA 22201

b. For ADPC & E:
Chief Legal Counsel
Arkansas Department of Pollution Control and Ecology
8001 National Drive
Little Rock, AR 72209

c. For Phoenix, InterCapital, Inter–Ag, and Bomar:
C.P. Bomar, Jr.
1119 Audubon Drive
Memphis, TN 38117

d. For Tomblin:
J. Randal Tomblin
303 Brooks Road East
Memphis, TN 38109

Any of these addresses may be changed upon thirty (30) days notice by the party involved to all the other parties.

18. *Public Comment*

This Consent Decree shall be subject to the public comment procedures of 42 U.S.C. §§ 6973(d), 9622(d)(2), 9622(i) and 28 C.F.R. § 50.7. Notice of the lodging of this Consent Decree shall be published in the Federal Register and the Department of Justice shall accept comments on this Consent Decree for a period of at least thirty (30) days prior to entry by the Court. The United States and ADPC & E may withdraw their consent to this Decree if comments disclose facts or considerations which indicate that the proposed Consent Decree is inappropriate, improper or inadequate. The Phoenix Parties, however, agree to be bound by the terms as of the date of their signature and may not withdraw their consent unless the United States and ADPC & E have formally advised the Court that they are withdrawing their consent.

19. *Non–Admission of Liability*

Nothing in this Consent Decree constitutes an admission of liability by any of the Phoenix Parties or an admission to the truth of the facts alleged in the complaints filed against them. Except as expressly provided herein, the Phoenix Parties do not waive any defenses which they may have in any action, other than a proceeding to enforce this Consent Decree.

20. *Effective Date Modification and Termination*

a. This Consent Decree shall be effective upon entry by the Court.

b. This Consent Decree shall not be modified except upon written approval by the Court.

c. This Consent Decree shall terminate when the Phoenix Parties have made all payments required of them under paragraphs 4, 8, and 10.

d. The Covenants Not to Sue in paragraph 13 shall survive the expiration of this Consent Decree, unless those Covenants have become ineffective, as provided in paragraphs 4, 13.b, 13.c, 13.d, 13.e, 13.f or 13.g. In the event that these Covenants become ineffective, the Phoenix Parties waive any rights they may have to raise the statute of limitations or laches as a defense to any action brought against them by the United States or ADPC & E with respect to Covered Matters.

e. The grant of access in paragraph 5 shall survive the termination of this Consent Decree.

Dated this 4 day of February, 1991.

/s/ George Howard, Jr.
United States District Judge

AGREED TO:

United States of America

/s/ Donald A. Carr
Donald A. Carr
Acting Assistant Attorney General
Land and Natural Resources Division
U.S. Department of Justice

/s/ Edward E. Reich
Edward E. Reich
Acting Assistant Administrator for
Enforcement and Compliance Monitoring
U.S. Environmental Protection Agency

/s/ Robert E. Layton, Jr.
Robert E. Layton, Jr., P.E.
Regional Administrator
U.S. Environmental Protection Agency
Region 6

Charles A. Banks
United States Attorney
Eastern District of Arkansas

by: /s/ A. Doug Chavis
A. Doug Chavis
Assistant United States Attorney
P.O. Box 1229
Little Rock, AR 72203 501/378–5221

/s/ Wendy E. Wagner
Wendy E. Wagner
Attorney, Environmental Enforcement Section
U.S. Department of Justice

/s/ Seth Thomas Low
Seth Thomas Low
Assistant Regional Counsel
U.S. Environmental Protection Agency
Region 6

Arkansas Department of Pollution
Control and Ecology

/s/ Randall Mathis
Randall Mathis
Acting Director

/s/ Steve A. Weaver
Steve A. Weaver
Chief Legal Counsel
Phoenix Capital Enterprises, Inc.

By: /s/ C.P. Bomar, Jr.
C.P. Bomar, Jr.
President and Director

/s/ Susan Getzendanner
Susan Getzendanner
Counsel
Intercapital Industries, Inc.

By: /s/ C.P. Bomar, Jr.
C.P. Bomar, Jr.
President and Director

/s/ Susan Getzendanner
Susan Getzendanner
Counsel
Inter–Ag Corporation

By: /s/ C.P. Bomar, Jr.
C.P. Bomar, Jr.
President and Director

/s/ Susan Getzendanner
Susan Getzendanner
Counsel
C.P. Bomar, Jr.

By: /s/ C.P. Bomar, Jr.
C.P. Bomar, Jr.

/s/ Susan Getzendanner
Susan Getzendanner
Counsel
J. Randal Tomblin

By: /s/ J. Randal Tomblin
J. Randal Tomblin

## APPENDIX A TO CONSENT DECREE

### PHOENIX CAPITAL ENTERPRISES, INC.

*Procedures For Calculating
Pre–Tax Profit*

The following provisions and procedures shall apply in calculating Phoenix's pre-tax profits solely for the purposes of determin-

ing the amount of any payments due under paragraph 8.a of the Consent Decree:

1. Pre-tax income shall be calculated on a consolidated group basis for Phoenix and its Subsidiaries. Phoenix and its Subsidiaries shall use the same fiscal year for accounting purposes, which shall be the calendar year.

2. For purposes of determining pre-tax profit, all payments, whether salary, wages, compensation, royalties, fees, commissions, bonuses, dividends, profit sharing or other compensation, to officers, directors or shareholders of Phoenix or any of its Subsidiaries, shall not be considered an expense of the business, except for the following amounts: for C.P. Bomar, Jr., and Jerry Manley $75,000 each, and for each of the other officers, directors and shareholders (who are also employees), $70,000; however, these salaries may be increased annually by an amount equal to the ratio amount of the increase in the Consumer Price Index for that year to the previous year's salary. Any officer, director or shareholder of Phoenix or any of its Subsidiaries who is not a full-time employee of any of those companies shall not be paid an amount which exceeds the ratio of the hours actually worked to the hours which a full time employee would have worked times the salary of such a full time employee, such full-time salary not to exceed $70,000. However, directors who are not officers, shareholders or employees of Phoenix or any of its Subsidiaries, and who are not members of the family of any officer or shareholder of Phoenix or any of its Subsidiaries, may be paid a director's fee of not more than $1500 per directors' meeting, not to exceed four meetings per year; no more than two such directors may be paid this fee in the same year. Moreover, no payments to family members of the officers, directors or shareholders of Phoenix or any of its Subsidiaries shall be considered an expense of the business, unless the certified public accountant certifies in its annual report required under paragraph 8.c of this Consent Decree that such payments were made in the ordinary course of

the business for goods or services and that the amount paid was reasonable for the value provided. In no event shall a family member receive more than $70,000 per year.

3. The officers, directors and shareholders of Phoenix and its Subsidiaries who are also full time employees shall be entitled to receive the following fringe benefits: life, health and disability insurance, vacation and holidays, and retirement benefits, unless the certified public accountant preparing the annual report required under paragraph 8.c of the Consent Decree determines that such payments are excessive considering the employees service, the practice of similar businesses and the financial condition of Phoenix and its Subsidiaries. For the purposes of determining pre-tax profit, any amounts determined to be excessive shall be disallowed as an expense of the business. Phoenix and its Subsidiaries may pay an automobile allowance of not more than $400 per month to full-time officers who use automobiles for business purposes; this payment may be made to no more than three officers. FICA payments shall be considered an expense of the business.

4. Neither Phoenix nor any of its Subsidiaries shall borrow any money from Bomar or any entity in which Bomar has, either directly or indirectly, any ownership or other financial interest, except at prevailing market rates.

5. Phoenix and its Subsidiaries shall maintain a consolidated debt to equity ratio of 1.2:1. No dividends shall be paid to Phoenix shareholders, if such payment causes the amount of debt to exceed the amount of equity. If losses cause the amount of debt to increase above the equity, then Bomar, as shareholder of Phoenix, shall be required to repay to Phoenix all dividends received since December 31, 1989 to the extent necessary to restore the debt to equity ratio to 1.2:1. If Bomar does not make these payments, he shall be personally liable to the United States for the amount of the dividends received.

6. Once the Phoenix Parties have made the payment required under paragraph 8.a,

Phoenix Parties may pay, to the extent provided by law, the balance of its profit as dividends to its common stock shareholder(s), whether such dividend is paid during the year that profit is earned or in subsequent years from retained earnings. No dividends shall be paid with respect to preferred stock. However, in the event that Phoenix liquidates prior to the Termination Date, all dividends which were paid to Phoenix's shareholders within two years prior to the date of liquidation shall be considered as part of the liquidation proceeds for determining the United States' share of such proceeds under paragraph 8.e, and to the extent that the funds remaining in Phoenix are insufficient to pay the United States its full forty (40) percent share of the net proceeds of liquidation of Phoenix, Bomar shall pay the difference to the United States, to the extent of all dividends which were received by the shareholders within two years prior to the date of liquidation.

7. For purposes of calculating pre-tax profit under this Consent Decree, depreciation and amortization expense shall only be calculated on a straight line basis over the useful life of the asset and not based on the useful life for tax purposes.

8. Phoenix may not guarantee obligations of other entities or individuals or to pledge its stock or assets without full consideration for the obligation being given to Phoenix.

9. Neither Phoenix nor any of its Subsidiaries shall make any cash advances or loans to any corporation or other business enterprise in which C.P. Bomar, Jr. has any interest, direct or indirect, except other Phoenix Subsidiaries.

10. The year end financial statements of the consolidated group of Phoenix Capital Enterprises, Inc. (Phoenix and the Phoenix Subsidiaries) shall be prepared on a full accrual basis according to generally accepted accounting principles. Generally accepted auditing standards are to be followed in performing the audit. Additional procedures are to be performed as designated below and reported upon:

a. A schedule disclosing all entities of which the Phoenix Parties own or have an option to purchase a five (5) percent or greater interest, that are doing business with the Phoenix Parties. This list will constitute Related Parties for purposes of the additional procedures described below. Each entity is to be described as to its purpose and types of transactions with Phoenix or any of its Subsidiaries or Vertac.

b. A detailed listing and description of all transactions with parties related to Phoenix or any of its Subsidiaries or Vertac that occurred during the year and any subsequent events with Related Parties, including Bomar and Tomblin.

c. A detailed listing of all compensation (including all consideration such as, but not limited to, reimbursement of expenses, salary, commissions, royalties, fees, etc.) paid to C.P. Bomar, Jr. and all other officers, directors or shareholders during the year, including the amount, date, purpose and documentation that exists to verify the transaction. For any transaction over $500 (except salary) provide copies of all supporting documents to the auditors. The list is to include any payments to members of the family of C.P. Bomar, Jr. and all other officers, directors or shareholders. A statement by the auditor that he or she has reviewed the payments to these individuals and that documentation does or does not support the existence of an appropriate business purpose and that the amounts paid are or are not reasonable in exchange for the goods or services provided.

d. A statement by the auditor that he or she is independent of Phoenix and its Subsidiaries, their shareholders and the Related Parties.

e. A statement that depreciation and amortization are computed on the straight line basis over the useful life of the asset. A description of any assets being amortized is to be included.

f. Computation of the debt to equity ratio for the year end and the dates and amounts of any dividends, loans, or advances made to the shareholders or Related Parties.

g. Accounts payable are to be confirmed by the auditor to verify the year end balance.

h. A detailed listing of all assets sold or transferred to a related party and a comparison of price or value to all other transactions involving similar assets between Phoenix and third parties.

i. A listing of creditors with a security interest in any assets of Phoenix including name, amount of debt, value and type of consideration given for the security and the amount of security.

j. An unqualified opinion of the auditor with respect to the fairness of the presentation of the financial statements.

k. Calculation by the auditor of the pre-tax profit earned by Phoenix during the year. This amount will be the amount from which the United States will receive thirty-three (33) percent and is to be calculated in accordance with paragraph 8 of this Consent Decree and this Appendix A.

11. Phoenix and its Subsidiaries shall be required to keep the appropriate documents required to justify the business purpose of all travel and entertainment or any other expense reducing pre-tax income. This documentation shall include the documents required by the Internal Revenue Code Sections 162 and 212 and such documentation should be required to be available for the auditor's inspection at each audit. If such documentation is not present for the auditor's inspection, then the expense shall be disallowed as a reduction of pre-tax income.

12. As part of the annual audit, the auditor will be required to confirm the accounts receivable. The confirmation process shall include confirming the balance due (even if none exist on Phoenix's records) for all customers during the year. A negative confirmation letter may be sent to all accounts that have a balance of less than $10,000.

13. As part of the annual audit, the auditor will observe the taking of the inventory, unless he or she receives independent confirmation of the inventory. If the auditor deems necessary, he or she will perform a comparative analysis of the historical amounts of obsolete goods and cost of goods sold and industry statistics.

14. Any and all sales of assets, including inventory, to Related Parties are to be fully disclosed as to dollar amount, quantity, price and the resale value made by the Related Party to third parties. A comparison of all similar types of asset sales made to third parties including dollar amount, quantity, and price are to be fully disclosed. Any "bargain" prices given to related parties should not be allowed to be a reduction of pre-tax profits.

15. If requested by the United States, the certified public accounting firm (auditor) performing the annual audit for Phoenix and its Subsidiaries may be replaced if the United States has reason to believe that such a change is necessary in order to insure the independence and objectivity of the audit. Nonetheless, the United States may requested a change of auditors once every three years without showing cause.

16. It is expressly agreed that the provisions of paragraphs 1–3, 5–7 and 10–15 of this Appendix A relate solely to the calculation of pre-tax profits for the purposes of determining the amounts of any payments due to the United States under paragraph 8 of the Consent Decree and for the purpose of reporting the financial condition of Phoenix and its Subsisidiaries pursuant to this Consent Decree, and that these provisions create no other right, obligation or remedy that is enforceable for any other purpose by the parties hereto. The United States may specifically enforce the prohibitions in paragraphs 4, 8 and 9 of this Appendix A.