# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-4310

_____

Pat Costner, United States ex rel.;          *
Sharon Golgan; Carolyn Lance;                *
Debra Litchfield; Becky Summers;             *
Kenny Brown; Edward Campbell;                *
Don Daniel; Jeffrey Foot; Clifton            *
Garry; David Hermanson; Michael              *
Shelton; Arkansas Peace Center;              *
Vietnam Veterans of America,                 *    Appeal from the United States
Arkansas State Council, Inc.,                *    District Court for the
                                             *    Eastern District of Arkansas.
            Plaintiffs/Appellees,            *
                                             *
        v.                                   *
                                             *
URS Consultants, Inc.; Morrison              *
Knudsen Corporation,                         *
                                             *
            Defendants/Appellants,           *
                                             *
MRK Inclineration, Inc.;                     *
                                             *
            Defendant,                       *
                                             *
Vertac Site Contractors,                     *
                                             *
            Defendants/Appellants.           *

_____

Submitted:  June 12, 1998

Filed:  August 17, 1998
_____

Before WOLLMAN and MURPHY, Circuit Judges, and DOTY,[1] District Judge.
_____

WOLLMAN, Circuit Judge.

This is a *qui tam* action brought on behalf of the United States by relators[2] pursuant to the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733 (1983 & Supp. 1998).  The complaint alleges that URS Consultants, Inc., Morrison Knudsen Corporation, and Vertac Site Contractors engaged in a pattern of knowingly submitting false claims for payment of funds under their contracts to perform hazardous waste treatment and disposal services at the Vertac Chemical Plant site in Jacksonville, Arkansas.  The United States has declined to intervene.  Defendants appeal from an order by the district court denying their motions to dismiss.  We affirm in part, reverse in part, and remand.

**I.**

From 1948 to 1987, the Vertac site was home to various chemical, herbicide, and pesticide production facilities.[3]  Throughout the years, chemical waste from such

_____

[1]The HONORABLE DAVID S. DOTY, United States District Judge for the District of Minnesota, sitting by designation.

[2]Relators consist of environmental groups and private citizens, some of whom are previous employees of the defendants.

[3]The site consists of 92.7 acres and is bounded by both residential and undeveloped areas.  Rocky Branch Creek flows directly through the plant site.  The creek is a tributary of the Bayou Meto River, which is itself a tributary of the Arkansas River.  The site was originally developed by the U.S. government in the 1930s as a

activity was deposited in landfills and stored in drums or barrels above ground with little or no attention to human health or environmental consequences. As a result, the site became extremely contaminated with dioxin and other highly toxic chemicals. The United States Environmental Protection Agency (EPA) has placed the site on the Superfund National Priorities List.

## A.

In 1979, after the Centers for Disease Control concluded that the Vertac site constituted a significant risk to public health, Vertac Chemical and its predecessor, Hercules, entered into a compact with the EPA and the Arkansas Department of Pollution Control and Ecology (the state) to take certain remedial and preventative measures. Although Vertac Chemical substantially complied with these measures, dioxin levels continued to rise in the environment surrounding the site, particularly in the Rocky Branch and Bayou Meto tributaries. In 1980, a federal district court issued a preliminary injunction ordering the company to undertake further remedial actions to arrest leakage of toxic chemicals from its disposal sites. See United States v. Vertac Chem. Corp., 489 F. Supp. 870, 888-89 (E.D. Ark. 1980) (Vertac I). In 1982, Vertac Chemical entered into a consent decree with the EPA and the state. A negotiated remedial plan was subsequently approved and enforced by the district court. See United States v. Vertac Chem. Corp., 588 F. Supp. 1294 (E.D. Ark. 1984) (Vertac II); United States v. Vertac Chem. Corp., 671 F. Supp. 595, 610-13 (E.D. Ark. 1987) (Vertac III), vacated, 855 F.2d 856 (8th Cir. 1988) (table).

---

munitions factory. In 1948, a corporation named Reasor-Hill purchased the site and converted it to pesticide and herbicide production. In 1961, the site was purchased by Hercules, Inc., which continued production of various chemical products, including large quantities of Agent Orange, a herbicide used by the government to clear jungle undergrowth during the Vietnam war. In 1976, Hercules sold the facility to Vertac Chemical Corp. (formally known as "Transvaal, Inc.").

Substantial cleanup began in 1987, following Vertac Chemical's abandonment of the site. After learning that approximately 28,000 corroding and leaking drums of toxic waste had been left on the premises, the EPA initiated an emergency removal action pursuant to section 9604 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9675 (1995 & Supp. 1998). The state then negotiated a contract for on-site incineration of the waste with MRK Incineration, Inc., which subsequently assigned the contract to Vertac Site Contractors, a joint venture composed of MRK and MK Environmental Services, a division of Morrison Knudsen Corp. The state facilitated payment for the project from a trust fund that had been created as a result of negotiations involving the EPA, the state, and Vertac Chemical. See Arkansas Peace Ctr. v. Arkansas Dep't of Pollution Control & Ecology, 999 F.2d 1212, 1214 (8th Cir. 1993) (Arkansas Peace III). As detailed by the court in United States v. Vertac Chem. Corp.: "The United States, ADPC & E, and Vertac entered into a stipulation under which . . . Vertac agreed to provide financial assurances that it would meet its environmental clean up responsibilities under the Consent Decree." 756 F. Supp. 1215, 1217 (E.D. Ark. 1991) (Vertac IV), aff'd, 961 F.2d 796, 797 (8th Cir. 1992). Specifically, "Vertac agreed to put up a $6.7 million trust fund, a $4 million letter of credit for environmental cleanup of the Vertac site, and a $3.15 million disbursement from the shareholders. The money in the letter of credit was later placed in the trust fund." Vertac IV, 756 F. Supp. at 1217.

Pursuant to the agreement, the state imposed various conditions regarding the operation of the incinerator constructed by the contractors, but certified that the contractors had demonstrated the ability to satisfy state and federal regulations. In 1991, the district court approved and entered an additional consent decree. See id. at 1219. The EPA remained involved in the cleanup by monitoring air quality, handling and transporting the drums of waste to be incinerated by the contractors, and disposing of incinerator ash.

In 1992, after it became clear that the trust fund would not be sufficient to complete the cleanup, the EPA assumed primary responsibility for the site and approved a federal removal action using federal funds.[4] See Arkansas Peace III, 999 F.2d at 1214. When the trust fund was depleted, the state terminated its contract with Vertac Site Contractors.[5] Soon after, the EPA assigned general oversight authority of the site to URS Consultants, Inc. URS then entered into a contract with Vertac Site Contractors to continue incineration activities. In 1995, the EPA transported the remaining drums of toxic waste to a site in Kansas for incineration. Although incineration at the Vertac site has thus ended, cleanup activities are ongoing, including remediation of the groundwater and soil. Litigation over costs of the cleanup has continued as well. See United States v. Vertac Chem. Corp., 966 F. Supp. 1491, 1495-96 (E.D. Ark. 1997) (Vertac VII).

**B.**

Throughout the years, outside parties have attempted to intervene in the Vertac site cleanup.[6] In 1992, several environmental groups, including two of the current

---

[4]The Superfund is the general federal fund for hazardous waste management under CERCLA. 42 U.S.C. § 9611. "Any site listed on the National Priorities List under CERCLA § 9605(a)(8)(B), is subject to EPA-funded cleanup activity. These EPA cleanups are financed by the Superfund, an $8.5 billion fund created by EPA taxes and fees. See 26 U.S.C. § 9507." United States v. City and County of Denver, 100 F.3d 1509, 1511 (10th Cir. 1996).

[5]The district court subsequently rejected a claim that the United States should itself be held liable under CERCLA for the cleanup as an "operator" or "arranger" in the production of Agent Orange. See United States v. Vertac Chem. Corp., 841 F. Supp. 884, 889 (E.D. Ark. 1993) (Vertac V); 42 U.S.C. § 9607(a)(2)-(3). We affirmed. See United States v. Vertac Chem. Corp., 46 F.3d 803, 805 (8th Cir. 1995) (Vertac VI).

[6]The activity on the Vertac site has also been the subject of various personal injury and property actions alleging exposure to dioxin. See, e.g., O'Dell v. Hercules, Inc., 904 F.2d 1194, 1197-1200 (8th Cir. 1990).

relators, filed suit in district court alleging violation of state and federal regulations and seeking to enjoin incineration at the site. Ultimately, the district court issued a preliminary injunction. See Arkansas Peace Ctr. v. Arkansas Dep't of Pollution Control & Ecology, 23 Envtl. L. Rep. 20807 (E.D. Ark. Mar. 17, 1993) (Arkansas Peace I). The court based its decision primarily on its finding that defendants had failed to establish that the incinerating process could achieve the required destruction and removal efficiency level on the dioxin contained in the chemical waste. See id.; 40 C.F.R. § 264.343(a)(2).

We stayed the preliminary injunction pending appeal. See Arkansas Peace Ctr. v. Arkansas Dep't of Pollution Control, 992 F.2d 145, 147 (8th Cir. 1993) (Arkansas Peace II). We later reversed the district court's grant of a preliminary injunction and ordered the case dismissed for lack of subject matter jurisdiction. See Arkansas Peace III, 999 F.2d at 1218-19. We did so because of our conclusion that the claim was barred by section 113(h) of CERCLA, which, subject to certain exceptions, generally denies jurisdiction to federal courts over challenges to removal or remedial action under section 9604 of CERCLA. See id. at 1216-18; 42 U.S.C. § 9613(h). Specifically, we held that CERCLA permitted private citizens to challenge removal or remedial actions under section 9604 only after the cleanup has been completed. See Arkansas Peace III, 999 F.2d at 1216-17. This is so even when the claim has been couched in terms of a violation of the Resource Conservation and Recovery Act (RCRA). See id. at 1217.

In 1994, a similar action, this time framed as a state nuisance suit, was filed in Arkansas state court. Defendants removed the case to federal court. The district court concluded that CERCLA conferred exclusive jurisdiction over plaintiffs' claims. It then dismissed the claims with prejudice for lack of subject matter jurisdiction under section 113(h) of CERCLA, concluding that under our holding in Arkansas Peace III, the Act barred such claims until the remedial action had been completed. In the

alternative, the court dismissed the claims on grounds of res judicata. See <u>Arkansas Peace Ctr. v. Environmental Protection Agency</u>, No. LR-C-94-265, Amended Order at 5-6 (E.D. Ark. August 4, 1994) (<u>Arkansas Peace IV</u>). Plaintiffs' appeal from that decision was voluntarily dismissed. Their motion to vacate the decision was subsequently denied. <u>See</u> Order at 6 (E.D. Ark. April 24, 1996) (<u>Arkansas Peace V</u>). The incineration activity at the Vertac site has also been the subject of several other state court actions and administrative proceedings.

Relators filed the current action under the FCA, alleging eight counts of knowing submission of false claims for payment. The district court denied defendants' motions to dismiss on various grounds. On appeal, defendants contend that: (1) the claims are barred under principles of res judicata; (2) the claims are barred by section 113(h) of CERCLA; (3) the claims are barred by section 3730(e)(3) of the FCA; and (4) to the extent that defendants' alleged false claims for payment were not claims made against the United States, they are not properly the subject of a FCA suit. Our review is de novo. <u>See</u> <u>Phillips v. Ford Motor Co.</u>, 83 F.3d 235, 239 (8th Cir. 1996).

## II.

Defendants first contend that the claims in the complaint are barred under principles of res judicata and should therefore have been dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Under the doctrine of res judicata, also known as claim preclusion, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." <u>United States v. Gurley</u>, 43 F.3d 1188, 1195 (8th Cir. 1994) (quoting <u>Montana v. United States</u>, 440 U.S. 147, 153 (1979)). A claim will be held to be precluded by a prior lawsuit when: (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involve the same parties (or those in privity with them); and (4) both suits are based upon the same claims or causes of action. <u>See</u> <u>In re Anderberg-Lund Printing Co.</u>, 109 F.3d 1343, 1346 (8th Cir.

1997); Kulinski v. Medtronic Bio-Medicus, Inc., 112 F.3d 368, 372 (8th Cir. 1997) (subsequent history omitted). "Furthermore, the party against whom res judicata is asserted must have had a full and fair opportunity to litigate the matter in the proceeding that is to be given preclusive effect." In re Anderberg-Lund, 109 F.3d at 1346.

Regarding the "final judgment on the merits" element of claim preclusion, we have stated that a prior dismissal premised upon subject matter jurisdiction

> should preclude relitigation of the same [jurisdiction] issue but not a second suit on the same claim even if arising out of the identical set of facts. . . . [W]here the second suit presents new theories of relief, admittedly based upon the same operative facts as alleged in the first action, it is not precluded because the first decision was not on the merits of the substantive claim.

Kulinski, 112 F.3d at 373 (quoting McCarney v. Ford Motor Co., 657 F.2d 230, 233-34 (8th Cir. 1981)) (citations omitted). In Arkansas Peace III (the primary prior judgment upon which defendants rely for their claim preclusion argument), we reversed the judgment for lack of subject matter jurisdiction. 999 F.2d at 1218. A subsequent action brought in state court and removed to federal court was similarly dismissed on jurisdictional grounds. See Arkansas Peace IV, Amended Order at 5-6.

Regarding the "same claims or causes of action" element of claim preclusion, we have stated that whether a second lawsuit is precluded turns on whether its claims arise out of the "same nucleus of operative facts as the prior claim." Gurley, 43 F.3d at 1195 (quoting Lane v. Peterson, 899 F.2d 737, 742 (8th Cir. 1990)). In Gurley, we held that the EPA's CERCLA claim brought against an oil reclamation company was barred by its previous claim brought under the Clean Water Act. See id. at 1195-97. We recognized that in conducting a claim preclusion analysis, "[t]he legal theories of the two claims are relatively insignificant because 'a litigant cannot attempt to relitigate the

same claim under a different legal theory of recovery.'" Id. at 1195 (quoting Poe v. John Deere Co., 695 F.2d 1103, 1105 (8th Cir. 1982)). And we concluded that "'[i]n the final analysis the test would seem to be whether *the wrong for which redress is sought* is the same in both actions.'" Gurley, 43 F.3d at 1196 (quoting Roach v. Teamsters Local Union No. 688, 595 F.2d 446, 449 (8th Cir. 1979)) (emphasis supplied in Gurley).

The Arkansas Peace litigation was an effort to prevent perceived harm to the environment and public health by seeking enforcement of state and federal environmental regulations and an injunction against waste incineration activity at the Vertac site. In this case, the wrong for which relators seek redress is the alleged submission of false claims for the payment of funds, a claim based upon economic injury to the federal government. Although both claims have their genesis in the Vertac site cleanup, they are independent of each other and seek to redress different injuries resulting from distinct conduct. Thus, the FCA allegations are not, as defendants assert, simply a repackaging of prior claims, but constitute a new set of charges arising from a separate "nucleus of operative facts" upon which no final judgment has been previously rendered. Therefore, the claims are not precluded on grounds of res judicata and are sufficient to survive a motion to dismiss on jurisdictional grounds.

## III.

Next, the contractors contend that the district court should have dismissed the complaint as barred under section 113(h) of CERCLA, 42 U.S.C. § 9613(h). That section provides that "[n]o Federal court shall have jurisdiction under Federal law . . . to review any challenges to removal or remedial action selected" by the EPA under

sections 9604 or 9606(a) of the Act.  42 U.S.C. § 9613(h); see also Arkansas Peace III, 999 F.2d at 1216; Gopher Oil Co. v. Bunker, 84 F.3d 1047, 1051 (8th Cir. 1996).[7]

In enacting section 113(h), "Congress intended to prevent time-consuming litigation which might interfere with CERCLA's overall goal of effecting the prompt cleanup of hazardous waste sites." Denver, 100 F.3d at 1514; see also Clinton County Comm'rs v. United States Envtl. Protection Agency, 116 F.3d 1018, 1022-25 (3d Cir. 1997) (en banc), cert. denied, 118 S. Ct. 687 (1998) (detailing legislative history of section 113(h)).  "Thus, once an activity has been classified as a CERCLA § 9604 removal or remedial action, § 9613(h) 'amounts to a blunt withdrawal of federal jurisdiction.'" Hanford Downwinders Coalition, Inc. v. Dowdle, 71 F.3d 1469, 1474 (9th Cir. 1995) (additional citations omitted).  Jurisdiction is denied to federal courts under this section, however, "only if a removal or remedial action is 'challenged' by plaintiffs." Id. at 1482.

Section 113(h) precludes "any challenges" to CERCLA removal actions -- not simply those brought under the provisions of CERCLA itself.  Arkansas Peace III, 999 F.2d at 1217; see also Clinton County, 116 F.3d at 1027; McClellan Ecological Seepage Situation v. Perry, 47 F.3d 325, 329 (9th Cir. 1995) ("Section 113 withholds federal jurisdiction to review any of [plaintiff's] claims, including those made in citizen suits and under non-CERCLA statutes, that are found to constitute 'challenges' to ongoing CERCLA cleanup actions"); United States v. State of Colorado, 990 F.2d 1565, 1577 (10th Cir. 1993) ("the plain language of § 9613(h) bars federal courts from exercising jurisdiction, not only under CERCLA, but under *any* federal law to review a challenge to a CERCLA remedial action").  The question before us, then, is whether relators' allegations under the False Claims Act amount to "challenges to removal or remedial action" that are barred by the plain language of section 113(h).

_____

[7]The statute lists five exceptions, none of which have been identified by the parties as applicable in this case.

The Ninth Circuit has indicated that lawsuits that are "directly related to the goals of the cleanup itself" constitute challenges to removal actions that are barred by section 9613(h). McClellan, 47 F.3d at 330. A lawsuit may also be considered a "challenge" under section 113(h) when the relief sought "would constitute the kind of interference with the cleanup plan that Congress sought to avoid or delay by the enactment of Section 113(h)." Id. The Ninth Circuit has held that state law claims for damages resulting from diversion of excessive water under a cleanup order issued by the EPA did not constitute a "challenge" to the cleanup plan, as "resolution of the damage claim would not involve altering the terms of the cleanup order." Beck v. Atlantic Richfield Co., 62 F.3d 1240, 1243 (9th Cir. 1995) (per curiam). "If the plaintiffs prevail," the court reasoned, "the remedy would be financial compensation for lost crops and lost profits." Id. Because "[s]uch a remedy would not interfere with . . . implementation of the cleanup," it was not barred by section 113(h). Id.; see also Durfey v. E.I. DuPont De Nemours Co., 59 F.3d 121, 125-26 (9th Cir. 1995) (class action asserting state medical monitoring tort claims against operating contractors of plutonium production facility did not constitute "challenge" to CERCLA cleanup action so as to invoke section 113(h) jurisdictional bar).[8]

---

[8]Several other circuits have addressed the issue of what constitutes a challenge under section 113(h) of CERCLA, though without identifying any particular test to be applied in making the determination. In State of Colorado, the Tenth Circuit held that action by the state to enforce a compliance order under its state waste management act, issued pursuant to its EPA-delegated authority to enforce state hazardous waste laws under the RCRA, was not a challenge to a CERCLA response action under section 113(h). 990 F.2d at 1575. In Schalk v. Reilly, the Seventh Circuit held that section 113(h) barred private citizens from bringing a CERCLA citizens suit challenging a consent decree between EPA and the responsible party alleging that the failure to prepare an environmental impact statement violated the National Environmental Policy Act. 900 F.2d 1091, 1095 (7th Cir. 1990). The court reasoned that "challenges to the procedure employed in selecting a remedy nevertheless impact the implementation of the remedy and result in the same delays Congress sought to avoid by passage of the statute." Id. at 1097. And in Boarhead Corp. v. Erickson, the Third Circuit held that section 113(h) barred an action brought under the National Historic Preservation Act seeking to stay a CERCLA response action pending determination of whether the

In Arkansas Peace III, we determined that plaintiffs' claims, "although couched in terms of a RCRA violation," constituted a challenge to the EPA removal action so as to invoke the section 113(h) bar. 999 F.2d at 1217. In that case, however, plaintiffs sought and had been granted a preliminary injunction against incineration activity at the Vertac site. See id. at 1213. Here, relators seek neither review of nor injunction against any remedial activity on the site. Instead, they allege fraud and seek civil penalties on behalf of the United States. Resolution of this suit in relators' favor "would not involve altering the terms of the cleanup order," but would result only in financial penalties for alleged fraud regarding payments sought and received for past completed work. Beck, 62 F.3d at 1243. Thus, the complaint does not seek to interfere with the remediation process ongoing at the site, see id., nor is the suit "directly related to the goals of the cleanup itself." McClellan, 47 F.3d at 330. Accordingly, we hold that relators' FCA suit does not constitute a section 113(h)-barred challenge to remedial action at the Vertac site. The district court therefore properly denied defendants' motion to dismiss on this ground.

## IV.

Under the *qui tam* provisions of the False Claims Act, private persons acting on behalf of the government may sue those who defraud the government and share in any proceeds ultimately recovered. "The Act's jurisdictional scheme is designed to promote private citizen involvement in exposing fraud against the government, while at the same time prevent parasitic suits by opportunistic late-comers who add nothing to the exposure of the fraud." United States ex rel. Rabushka v. Crane Co., 40 F.3d 1509, 1511 (8th Cir. 1994) (subsequent history omitted).

---

property involved qualified for historic site status. 923 F.2d 1011, 1021-22 (3d Cir. 1991).

Defendants contend that the present claim is barred by section 3730(e)(3) of the FCA, which provides:

> In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

31 U.S.C. § 3730(e)(3) (Supp. 1998); see also United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1156 (3d Cir. 1991). Under section 3730(e)(3), then, "[i]f the government files an action to enforce the FCA, a would-be relator may not later bring any action based on the same underlying facts." United States ex rel. Kelly v. Boeing Co., 9 F.3d 742, 746 (9th Cir. 1993); see also United States ex rel. S. Prawer & Co. v. Fleet Bank of Maine, 24 F.3d 320, 326-28 (1st Cir. 1994) (detailing legislative history of section 3730(e)(3) of FCA). Thus, this section will typically bar only a "*qui tam* action based upon allegations or transactions pleaded *by the government* in an attempt to recover for fraud committed against it." Id. at 328.

Defendants argue that section 3730(e)(3) bars the present suit because it is "based upon allegations or transactions" that were already the subject of previous suits and administrative proceedings in which the government has participated. In essence, they contend that the prior litigation involving challenges to the cleanup activity at the Vertac site -- litigation in which the EPA was a defendant -- invokes the section 3730(e)(3) jurisdictional bar. This argument is without merit.

In Prawer, the First Circuit rejected the argument that a *qui tam* action alleging fraud on the part of a bank, a law firm, and an FDIC staff attorney would be barred by the FDIC's own collection case against the makers of promissory notes involved in a FDIC-supervised transfer of assets between two banks. 24 F.3d at 329. The court

stated that section 3730(e)(3) was enacted to bar parasitic *qui tam* actions in which the action "is receiving 'support, advantage, or the like' from the 'host' case (in which the government is a party) 'without giving any useful or proper return' to the government (or at least having the potential to do so)." Id. at 327-28. The court then concluded:

> [T]he FDIC . . . was *not* proceeding against the defendants to this action, for fraud or otherwise, in the Collection case. Therefore, because this case is seeking to remedy fraud that the government has not yet attempted to remedy, it is, as a threshold matter, wholly unlike the one the drafters of § 3730(e)(3) almost certainly had in mind and sought to preclude.

Id. at 328 (footnote omitted).

The present suit is based upon allegations of fraud involving the submission of false claims for payment for environmental remediation work completed at the Vertac site. Such allegations or transactions have never before been the subject of a FCA suit or any other suit or proceeding brought by the government or anyone else. As in Prawer, "because this case is seeking to remedy fraud that the government has not yet attempted to remedy, it is, as a threshold matter, wholly unlike" that which Congress sought to preclude by enacting section 3730(e)(3). Id. The district court therefore properly declined to dismiss the case on this ground.

## V.

Last, defendants contend that many of the allegations in relators' complaint are not properly the subject of a False Claims Act suit, as they do not involve claims made against the United States. Thus, they argue, the district court should have granted their motion to dismiss for failure to state a claim regarding those particular allegations.

Congress enacted the FCA to protect government funds and property from fraudulent claims. See Rainwater v. United States, 356 U.S. 590, 592 (1958). The Act

-14-

imposes liability upon any person who, *inter alia*, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)-(b) (Supp. 1998); see also United States ex rel. Glass v. Medtronic, Inc., 957 F.2d 605, 608 (8th Cir. 1992). To prove allegations brought under the FCA, then, relators "must show that a claim for payment from the government was made and that the claim was 'false or fraudulent.'" Rabushka ex rel. United States v. Crane Co., 122 F.3d 559, 563 (8th Cir. 1997), cert. denied, 118 S. Ct. 1336 (1998).

There are at least two sources of funds against which false claims are alleged to have been made by defendants: (1) the trust fund underwritten by Vertac Chemical; and (2) the federal Superfund under the supervision of the EPA. Relators contend that participation by the United States in negotiations that led to the stipulation by which Vertac Chemical "agreed to put up a $6.7 million trust fund, a $4 million letter of credit for environmental cleanup of the Vertac site, and a $3.15 million disbursement from the shareholders," see Vertac IV, 756 F. Supp. at 1217, is sufficient to render any claims for payment made against that fund and approved by the state of Arkansas susceptible to challenge in their *qui tam* action.

We do not believe that the FCA has as elastic an application as relators suggest. As defined in the FCA, a "claim"

> includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c) (Supp. 1998). In <u>United States v. McNinch</u>, the Supreme Court suggested that a "claim" under the FCA is a "demand for money" that induces the government to disburse funds or "otherwise suffer immediate financial detriment." 356 U.S. 595, 599 (1958). Subsequently, the Court indicated that the FCA "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." <u>United States v. Neifert-White Co.</u>, 390 U.S. 228, 233 (1968); <u>see also</u> <u>United States v. Rivera</u>, 55 F.3d 703, 709 (1st Cir. 1995).

Essentially, then, only those actions by the claimant which have the purpose and effect of causing the United States to pay out money it is not obligated to pay, or those actions which intentionally deprive the United States of money it is lawfully due, are properly considered "claims" within the meaning of the FCA. <u>See</u> <u>id.</u>; <u>United States v. Richard Dattner Architects</u>, 972 F. Supp. 738, 747 (S.D.N.Y. 1997).

None of the money in the private Vertac trust fund, long since depleted, was provided by the United States Government. No federal funds were ever intermingled with that fund. The United States had no access to the trust fund, nor did it have any control over its disbursement, which was overseen by the State of Arkansas. Moreover, no money disbursed from the private fund was ever reimbursed by the federal government. <u>See, e.g.</u>, <u>United States v. O'Connell</u>, 890 F.2d 563, 564-65 (1st Cir. 1989) (finding FCA violation in fraudulent payment request submitted to state agency that disbursed federal development grants).

The FCA "attaches liability, not to the underlying fraudulent activity, but to the 'claim for payment.'" <u>United States ex rel. Hopper v. Anton</u>, 91 F.3d 1261, 1266 (9th Cir. 1996), <u>cert. denied</u>, 117 S. Ct. 958 (1997) (quoting <u>Rivera</u>, 55 F.3d at 709). Any allegedly false claims for payment made by defendants to the Vertac trust fund had no nexus to the United States. We conclude that the FCA has no application in such circumstances. The district court erred, therefore, in denying defendants' Rule 12(b)(6) motions to dismiss relators' complaint to the extent that it alleged the knowing

submission of false claims for payment from the trust fund underwritten by Vertac Chemical.  To the extent that relators alleged the knowing submission of false claims for payment to the EPA, however, the court did not err in denying defendants' motions to dismiss for failure to state a claim upon which relief could be granted.

The judgment is affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.