# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-02-00578-CV
---

**Rhonda Lane, Appellant**

**v.**

**Texas Department of Health, Appellee**

---
**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
NO. GN102473, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING**
---

## M E M O R A D U M   O P I N I O N

This is an appeal from a summary judgment in a Texas Whistleblower Act case. Tex. Gov't Code Ann. §§ 554.001-.010 (West 1994 & Supp. 2003). Rhonda Lane sued her former employer, the Texas Department of Health, for wrongfully terminating her employment because she alleges the discharge resulted from her report of a violation of law by the Department. Although the violation that she reported amounted to only a breach of an internal agency policy, she argues that, at the time of the report, she had an objectively reasonable, good faith belief that the violation constituted a breach of federal law, entitling her to protection under the Act. Finding her arguments without merit, we will affirm.

**FACTUAL BACKGROUND**

Lane began working for the Department in 1984 as its Program Director for the Women, Infants & Children Program ("WIC"), which was federally funded. In February 1987, Lane was promoted to Special Project Director of the Nutritional Education Cancer Prevention Program, and when that program failed to receive funding she became the nutritionist for the WIC Program. In May 1988, Lane went into the private sector where she acted as a nutritional consultant, the program director for the weight control program at Austin Regional Clinic, and instructor in nutrition and chemistry at Austin Community College and San Antonio Community College.

Lane went back to work for the Department in May 1991 and served as a Health Program Specialist in the Division of Chronic Disease Prevention, then Assistant Bureau Chief for Administration in the Bureau of Chronic Disease Prevention, and eventually Staff Services Officer in the Grants Management Division. In July 1999, she was promoted to Program Administrator of the Clinical Resources Division, Bureau of HIV/STD Prevention. Up to that time, Lane had not been reprimanded or suffered any adverse employment action at the Department. However, on May 17, 2001, after some sixteen years with the Department, she was fired for what she claims were pretextual reasons.

Lane's responsibilities in the Clinical Resources Division included administering the Texas HIV Medication Program and the AIDS Drug Assistance Program, both programs were primarily funded with federal grants. Her responsibility included applying for and administering the federal grant associated with the HIV program.[1] Lane's first grant application to prepare for the HIV

---

[1] The federal grant program was established in the Ryan White CARE Act. *See* 42 U.S.C.A. §§ 300ff-300ff-111 (West 2003). The grants were limited in number and were awarded among the

medication program was for fiscal year 2000.  In reviewing grant applications from previous years, Lane noticed that the HIV medication program had not paid its allotted "indirect costs" to the Department.[2]  Lane knew that Department operating policy required that all federal grant programs pay "indirect costs" to the Department, unless a particular grant specifically prohibited such charges.

Lane went to her supervisor, Linda Moore, and inquired about the failure to pay "indirect costs" for the HIV medication program.  Lane alleges that Moore and another manager, Patty Melchior, advised her that they believed that the Department had received a waiver from paying "indirect costs."  Moore then instructed Lane to "leave the matter alone."  Lane continued pressing the issue as to why no documentation of a "waiver" could be found.

In early May, 2000, Lane went to Mary Alexander, in the Grants Management Division, who was responsible for monitoring the Department's grant applications and reports to the federal government.  Alexander confirmed Lane's suspicions that the HIV medication program should have paid "indirect costs" to the Department.  As a result of Lane's pressure, the HIV medication program had to refund $2.9 million of its grant money to the Department as "indirect costs" for the 1999 fiscal year.

Lane argues that at the time of her report she had formed a belief "that the Indirect Costs Policy was based upon federal laws governing the receipt of funds from federal grants."  She

---

states on a competitive basis.  There were detailed application and periodic reporting requirements associated with these grants, and recipient state agencies were subject to potential audits by the United States Department of Health and Human Services ("DHHS") or the Office of Management and Budget ("OMB").  In fiscal year 1999, Texas received grants of approximately $50 million for its HIV program.

[2] "Indirect cost" is a percentage of a federal grant which a state agency charges for administering a federal program; its purpose is to cover the cost of administrative overhead incurred by the agency in administering the program.

concluded that if the Department failed to pay "indirect costs" from grant monies it would "violate federal grant laws" which could affect whether Texas would receive future grants should DHHS or OMB audit the Texas program. Lane contends that her underlying concern was the risk that the violations posed to the continuation of the HIV and AIDS medication programs in Texas.

The parties do not dispute that after Lane's report to the Department's Grants Management Division that Lane's relationship with the other members of the Department, including her supervisor, sharply deteriorated. Lane received reprimands and her authority was repeatedly reduced and supervision over her increased. She was eventually terminated by Moore on May 17, 2001. Lane pursued an internal grievance procedure, then filed suit under the Whistleblower Act.

## DISCUSSION

The parties appear to agree that the Grants Management Division was the appropriate authority within the Department to address the "violation" reported by Lane. The question in this case is whether she reported a violation of law protected by the act.

### *Standard and Scope of Review*

The Department challenged Lane's cause of action with a no evidence motion for summary judgment. *See* Tex. R. Civ. P. 166a(i). The test for granting a "no evidence" motion for summary judgment is whether there is evidence presented supporting each of the essential elements of the claims on which the responding party would have the burden of proof at trial. *Id*. A movant of a no evidence motion does not have the burden of establishing its right to judgment as a matter of law, unlike the traditional motion. *Duvall v. Texas Dep't of Human Servs.*, 82 S.W.3d 474, 477

4

(Tex. App.—Austin 2002, no pet.). Rather, a no evidence motion puts the opposing party to its burden of producing more than a scintilla of probative evidence on each element of each claim or defense challenged in the motion. Tex. R. Civ. P. 166a(i).

The responding party is not required to marshal its proof, but it must present enough evidence to raise a genuine fact issue on the challenged elements. *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). Summary judgment will be granted if the opposing party fails to produce more than a scintilla of evidence on the matters challenged in the motion. *Duvall*, 82 S.W.3d at 478. Evidence amounts to more than a scintilla when it "rises to the level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (quoting *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994)). If the evidence produced by the opposing party is "so weak as to do no more than create a mere surmise or suspicion," it is only a scintilla and cannot withstand a no evidence motion for summary judgment. *See* Tex. R. Civ. P. 166a(i) and cmt.; *Duvall*, 82 S.W.3d at 478 (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

On the other hand, when reviewing no evidence summary judgments, just as with traditional motions for summary judgment, appellate courts construe the evidence, indulge all reasonable inferences, and resolve any doubts in favor of the opposing party. *Grant*, 73 S.W.3d at 215; *see also Nixon v. Mr. Prop. Mgmt Co.*, 690 S.W.2d 546, 548-49 (Tex.1985).

Here, the Department specified in its motion that Lane failed to make the requisite showing that she reported a violation of law in good faith. The district court agreed and the order granting summary judgment clearly and concisely set forth the court's reasoning for its decision. It

5

noted that all of Lane's evidence involved the Department's failure to charge indirect costs to the federal HIV program grant, which violated the Department's *internal policies*, but did not violate state or federal law. The court concluded there was no evidence that Lane reported a violation of law, therefore, her report did not satisfy the good-faith requirement of the act. We agree.

### *Texas Whistleblower Act*

The Texas Whistleblower Act protects public employees from adverse retaliatory employment actions when an employee in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority. Tex. Gov't Code Ann. §554.002(a) (West Supp. 2003). The purpose of the Act is to enhance openness in government and compel government's compliance with the law by protecting those who report wrongdoing. *Hill v. Burnet County Sheriff's Dept*, 96 S.W.3d 436, 440 (Tex. App.—Austin 2002, pet. denied); *see Castaneda v. Texas Dep't of Agric.*, 831 S.W.2d 501, 503 (Tex. App.—Corpus Christi 1992, writ denied).

To prevail on a whistleblower claim, one must show that: (1) a public employee; (2) acting in good faith made a report; (3) the report involved conduct violating law by the agency or a public employee; (4) the report was made to an appropriate law enforcement authority; and (5) the public employee suffered retaliation for making the report. Tex. Gov't Code Ann. § 554.002;[3]

---

[3] The act provides:

    (a) A state or local government entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law

6

*Duvall*, 82 S.W.3d at 478.  The act is remedial in nature and should be liberally construed to effect its purpose.  *Duvall*, 82 S.W.3d at 478; *Stinnett v. Williamson County Sheriff's Dep't*, 858 S.W.2d 573, 575 (Tex. App.—Austin 1993, writ denied).

"Good faith" is not defined in the act, but the supreme court has interpreted it to have both a subjective and an objective component.  *Wichita County v. Hart*, 917 S.W.2d 779, 784 (Tex. 1996).  In *Hart*, the supreme court held that "good faith" means that "(1) the employee believed that the conduct reported was a violation of law[4] and (2) the employee's belief was reasonable in light of the employee's training and experience."  *Id.*

To meet the objective prong of the "good faith" test, one must establish that a reasonably prudent public employee in similar circumstances, with similar training and experience, would have believed that the facts as reported amounted to a violation of law.  *See Hart*, 917 S.W.2d at 784-85; *Donlevy v. City of The Colony*, 8 S.W.3d 754, 757 (Tex. App.—Fort Worth 1999, no

---

enforcement authority.

(b)  In this section, a report is made to an appropriate law enforcement authority if the authority is a part of the state or local governmental entity or of the federal government that the employee in good faith believes is authorized to:

(1)  regulate under or enforce the law alleged to be violated in the report; or

(2)  investigate or prosecute a violation of criminal law.

Tex. Gov't Code Ann. § 554.002 (West Supp. 2003)

[4] Section 554.001(1)(a) defines "law" as: "(A) a state or federal statute; (B) an ordinance of a local governmental entity; or (C) a rule adopted under a statute or ordinance."  Tex. Gov't Code Ann. § 554.001(1)(a) (West Supp. 2003).

pet.); *Duvall*, 82 S.W.3d at 482.[5]  The mere fact that the public employee has considerable experience and training by itself does not transform the employee's subjective belief into an objective conclusion.  *See Duvall*, 82 S.W.3d at 483; *Texas Dep't of Criminal Justice v. Terrell*, 18 S.W.3d 272, 277 (Tex. App.—Tyler 2000, pet. denied).  Objectiveness is a fact-intensive question determined on a case-by-case basis.

Courts have determined that the act does not protect reports of violations of internal agency policy not promulgated pursuant to a statute or ordinance.  *Harris County Precinct Four Constable Dep't v. Grabowski*, 922 S.W.2d 954, 956 (Tex. 1996); *Ruiz v. City of San Antonio*, 966 S.W.2d 128, 130 (Tex. App.—Austin 1998, no pet.).  Here, the district court concluded that Lane's report involved merely a report about the violation of internal agency policy and not a statute or ordinance.

On appeal, Lane argues that her subjective belief that the conduct she reported was a legal violation was reasonable under the circumstances and satisfied the objective prong of the good-faith test.  We disagree.  The supreme court addressed this argument in *Grabowski*.  There, the reporting employee argued that his subjective belief that a law had been violated, if reasonable, could satisfy the objective prong of the good-faith test.  The supreme court concluded that it did not.

_____

[5] On the other hand, the reporting employee does not ultimately have to have been correct about the violation of law.  For instance, if an investigation reveals that there was no actual legal violation, the employee is still protected if the report was objectively reasonable considering the circumstances.  *See, e.g.*, *Llanes v. Corpus Christi Indep. Sch. Dist.*, 64 S.W.3d 638, 642 (Tex. App.—Corpus Christi 2001, pet. denied); *Lastor v. City of Hearne*, 810 S.W.2d 742, 744 (Tex. App.—Waco 1991, writ denied).  Moreover, an employee need not identify the specific law when making the report, but there must be a law prohibiting the conduct being reported.  *Llanes*, 64 S.W.3d at 643.

*Grabowski*, 922 S.W.2d at 955-56; *see also Donlevy*, 8 S.W.3d at 757-58 ("Even if Donlevy subjectively believed a law had been violated, this belief was not reasonable.") (footnote omitted).

Grabowski presented summary judgment proof that he honestly believed that his supervisor's conduct violated the law. Nevertheless, the Court found that his subjective belief "fails to satisfy the second prong because his belief was not reasonable in light of his experience as a peace officer." *Grabowski*, 922 S.W.2d at 956. The court noted that it would carefully scrutinize a law enforcement officer's assessment of legal violations because they have considerably more experience and training to assess whether conduct is illegal. *Id.*

Although Lane is not a law enforcement officer, she did have considerable experience in applying for and administering federal grant programs. Between 1984 and 1987, she worked for the Department as Program Director for the WIC Program, a federally funded program for women, infants and children. She also worked for the Grants Management Division of the Department from February 1998 through July 1999. Lane judicially admitted in her pleadings that she had extensive experience applying for and administering federal grants. Based on this record, the district court was authorized to closely scrutinize the reasonableness of her belief.

In addition, Lane admitted in her pleadings that her report was about a violation of agency policy. Her Plaintiff's Original Petition alleged in paragraph 12 that:

> Based on her prior work experience, Lane had extensive knowledge of grant
> application procedures and requirements and, as a result, noted that THMP [Texas
> HIV Medication Program] had not paid "indirect costs" during fiscal years 1999 and
> 2000. Based on Lane's experience, apparently in accordance with federal law, the
> Department had implemented a policy which required that programs within state
> agencies (including the Department itself) that received federal grants must pay

9

"indirect costs" at the rate approved by the [DHHS] to the Department's Budget Office, in order to cover administrative and other expenses.

She alleged that she told Alexander that the grants "did not meet the Department's policy regarding 'indirect costs.'"[6]

In describing the retaliation she suffered, Lane's petition alleges that the retaliation was "done to retaliate against Lane because she had reported a potential violation of Department policy (and possibly federal law)." In paragraph 26, Lane refers to her termination as "retaliation for her report of policy violations (and potential illegal activity)." In her affidavit, submitted in response to the Department's motion for summary judgment, Lane averred that:

> TDH has written policies which require that all programs receiving federal grants must earmark a percentage of its funds to be recouped as "indirect costs" by TDH. . . . I believed in good faith, that this policy was based upon federal rules or requirements governing the receipt of federal funds, in part because "indirect costs" are calculated by applying rates set by the [DHHS], which controls TDH's receipt of funds.
>
> Additionally, I believed, in good faith, that it was a violation of law to submit a false, inaccurate or misleading document–such as a grant application or financial report– to the federal government. My belief was based in part on having seen news reports concerning people who have been held liable under both civil and criminal laws for providing false information to state or federal government [sic]. . . . I believed, in good faith, that THMP's grant applications were false, inaccurate or misleading because they failed to note that, under TDH policies, approximately 8.1% of the THMP budget could be used to pay "indirect costs" rather than purchasing medication for program participants.

---

[6] Apparently, the failure to pay "indirect costs" to the Department meant that there was $2.9 million more of grant monies to be spent on HIV and AIDS medication. Likewise, when the HIV medication program was forced to repay "indirect costs" to the Department, as a result of Lane's action, it meant that those funds could not be spent on medication.

10

Lane's amended pleadings contain virtually the same allegations. The statements in Lane's pleadings that the "violation" could "possibly" or "potentially" involved federal law only highlight the lack of a federal statute requiring that indirect costs be deducted from the HIV medication grant.

The deposition testimony of both the fiscal manager of the Department's HIV program and Mary Alexander established that "indirect costs" was money that the state insisted on collecting, rather than the federal government. The federal government limited the states to charging only 8.1% of the amount of the grants for recouping administrative costs.

### Federal Claims Act

Lane does not affirmatively identify a statue or ordinance the violation of which her report could have arguably addressed. She does cite to and intimates that the False Claims Act ("FCA") could have covered the conduct in question, but she does not affirmatively assert that the FCA actually covers the conduct in question. *See* 31 U.S.C.A. § 3729 (West 2003).

The FCA creates liability against any person who, among other things, knowingly presents a false or fraudulent claim to be paid or approved, or knowingly makes or uses a false record or statement to get a false or fraudulent claim paid or approved by the federal government. The liability created by the FCA is in *qui tam*, meaning that it creates a private cause of action by which a private party may sue, as "relator," on behalf of the government for restitution and to recover damages against anyone involved in defrauding the federal government. However, the United States Supreme Court held that a state bears no *qui tam* liability under the FCA by virtue of sovereign immunity. *Vermont Agency of Natural Res. v. United States*, 529 U.S. 765, 784-85 (2000); *Bly-Magee v. California*, 236 F.3d 1014, 1017 (9th Cir. 2001). Also, even if individual state officials

11

or employees are sued in their individual capacities, no FCA liability arises unless there is evidence that the official or employee converted the federal funds or property to their own personal use or benefit. *See Alexander v. Gilmore*, 202 F. Supp.2d 478, 481-82 (E.D. Va. 2002). There is no indication in this case that any public monies were converted to anyone's personal use.

Finally, regardless of whether the $2.9 million of federal funds had been paid to the Department as "indirect costs" or spent on HIV/AIDS medication, the federal government was not deprived of any money or property. The federal government was not deprived of money it otherwise would have kept but for the reported conduct. Without monetary deprivation, no liability arises under the FCA. *See Hutchins v. Wilentz*, 253 F.3d 176, 184 (3d Cir. 2001) ("The False Claims Act seeks to redress fraudulent activity which attempts to or actually causes economic loss to the United States government. . . . It was not intended to impose liability for every false statement made to the government."); *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 776 (8th Cir. 1998) ("Only those actions . . . which have the purpose and effect of causing the United States to pay out money it is not obligated to pay, . . . " are considered "claims" within the meaning of the FCA). As a matter of law, the FCA could not have been the legal basis of Lane's report regarding "indirect costs."

While we agree that a reporting employee's objective belief need not be correct and that a non-law enforcement employee need not prove up each element of the legal violation allegedly reported, we hold that there must be some actual legal basis to support the employee's subjective belief that a violation of law occurred. *See Grabowski*, 922 S.W.2d at 955; *Llanes*, 64 S.W.3d at 642-43 ("Otherwise, every complaint, grievance, and misbehavior could support a claim under the Act."); *Ruiz*, 966 S.W.2s at 130.

12

## CONCLUSION

For the reasons set forth above, appellant's issues on appeal are overruled. The judgment of the district court is affirmed.

_____

Mack Kidd, Justice

Before: Justices Kidd, Yeakel and Patterson

Affirmed

Filed: July 30, 2003